**UNITED STATES of America,
Plaintiff,**

v.

**David Karl DANSER, Defendant.**

**No. IP 98–161–CR–01 T/F.**

United States District Court,
S.D. Indiana,
Indianapolis Division.

Oct. 6, 1999.

---

**18.** While causation alone is not sufficient for a finding of coercion, *see* footnote 14, it is necessary for such a finding.

Steven Debrota, Assistant U.S. Attorney, Indianapolis, IN, for Plaintiff.

David J. Colman, Attorney at Law, Bloomington, IN, for Defendant.

## MEMORANDUM OF DECISION

TINDER, District Judge.

The Defendant, David Karl Danser (hereinafter Danser), is charged in a three count Indictment. In general terms, Count 1 charges him with causing a minor to engage in sexually explicit conduct for the purpose of producing a visual depiction of the conduct, either knowing that the depiction will be transported in interstate commerce or under circumstances in which the depiction was actually transported in interstate commerce. Count 2 charges that he crossed a State line with the intent to engage in a sexual act with a person under the age of 12. In Count 3, he is alleged to have been in possession of three or more pieces of child pornography. The Defendant has pled not guilty to all of these charges. However, he does not dispute that the prosecution has proved the essential elements of Counts 1 and 3. With respect to Count 2, he does not dispute that he crossed a State line and thereafter engaged in a sexual act with a girl under 12 years of age. He does dispute whether

there has been proof beyond a reasonable doubt that he crossed the State line with the intent to engage in a sexual act with the girl. He also raises the affirmative defense as to all three counts, specifically, that he was insane at the time of the events charged in the Indictment. This memorandum will discuss the facts and law which lead to the verdict in this case.[1]

## I. FINDINGS OF FACT

The two critical issues in the case are whether the North Carolina trip was undertaken by Danser with the intent to engage in a sexual episode and whether at the time of the Defendant's conduct alleged in the Indictment, he was legally insane. The discussion of the facts will be divided generally into the two relevant areas.

## A. FACTS RELATING TO THE CHARGES

The victim in Counts 1 and 2 (and one of the victims of Count 3) is Karen Doe (referred to as Jane Doe in the Indictment). She was born July 6, 1990. She came to live with the Danser family in August 1997. At the time, she was in the first grade. She is now nine years of age. Danser was aware that Karen Doe had previously been sexually molested by other persons before she came to live at the Danser residence.

Even before Karen Doe's arrival at the Danser house, Danser began preparing to gain a sexual advantage from her presence. In 1997, Danser purchased and installed a pinhole camera (Exhibit 26) behind a Winnie the Pooh mirror (Exhibit 27) in Karen Doe's room at the Danser residence. Jennifer Danser was aware that Danser had purchased a pinhole camera just prior to when Karen came to live

with them in order to install it in a hidden location in Karen's bedroom. Danser admits that he installed the Pinhole camera behind the Winnie Pooh mirror, Exhibit 27, which was in Karen Doe's room at the Danser residence. This camera was connected to a television and VCR in Jenny and David Danser's bedroom. Exhibit 26 is the color pinhole camera which Danser used to record the activities in Karen Doe's room in this manner. Exhibit 25 is a receipt for the purchase of this pinhole camera by Danser on August 5, 1997. Danser used this camera to secretly record nude videos of Karen Doe and other minors.

Shortly after Karen Doe came to live with the Danser family, Danser began to touch Karen in her genital or pubic area and later began having more explicit sexual contact with her. This included genital-genital and oral-genital contact, masturbation and either attempted or simulated sexual intercourse. Much of this was visually documented because Danser took many nude pictures of Karen Doe and his molestations of her. These consisted of both still photographs and videotapes. According to Karen Doe, nobody else was present in the various rooms when Danser took these pictures. Danser told Karen Doe how to pose for many of these pictures, including those of her spreading her legs and displaying her pubic area. His directions to her are also documented on the videotapes, corroborating what she said about these things. A viewing of the still and video photos also discloses that Danser directed Karen Doe in various lascivious exhibitions of her genitals or pubic area. It is also evident from viewing the videotapes that no one besides Karen Doe and Danser was present during the nefari-

---

1. The distinction between factual findings and legal conclusions is often a blurry one and some matters are mixed questions of law and fact. The court has attempted to provide a gross separation of the facts being found from the legal conclusions being applied simply for ease of readership. To any extent this memorandum may lack precision in separating the facts from the law or if it improperly labels a finding of fact, conclusion of law or mixed question of fact and law, no confusion is intended and all findings, conclusions and mixed questions should be considered to be what they are and not limited by their labeling.

ous filming. The videos and the explicit still photos of Karen Doe and the molestations were hidden away from everyone, especially Danser's wife, Jennifer Danser, in a carefully chosen hiding place at Danser's business.

Karen Doe has a detailed and accurate recollection of the molestations and she possesses a darkly precocious familiarity with sex-related terminology and activity. This is demonstrated during the videotapes and is also evident from the stipulations about her testimony. To Karen Doe, "having sex" included Danser placing the penis at the entrance to her vagina, Danser kissing and licking her vagina, and Danser asking her to lick and suck his penis.

The parties stipulated that Karen Doe would also testify that she knew Danser kept sex toys (sexual aids/devices) in his night stand drawer at this residence, that Danser asked her to use them sometimes during their sexual activities, he took photos of her with these sex toys sometimes and used these toys on her. Again, the photographic evidence confirms the accuracy of her stipulated testimony.

According to Karen Doe, prior to the North Carolina trip, these molestations that she describes as "having sex" happened in Danser and Jenny Danser's bedroom with the door closed and locked, and with the bedroom door open only if no one else was home. Yet again, the videotape evidence and a comparative still photograph of the Danser bedroom confirms her stipulated testimony about the location of these activities. Karen Doe recalled that on at least one occasion, when Karen Doe and Danser were in Danser's bedroom "having sex," Jenny Danser knocked on the door and wanted to come in. Karen Doe also recalled that on one occasion, Danser told her to get in the swimming pool when Jenny Danser knocked on the door. Jennifer Danser corroborates that on one occasion, she found Danser and Karen Doe alone in David and Jennifer

Danser's bedroom with the door closed and locked.

On April 23, 1998, Karen Doe and Danser began traveling from their home in Bloomington, Indiana to Carolina Beach, North Carolina by themselves. The trip began around 6:00 in the evening, after Karen had completed school for the day. After an overnight stop in Kentucky or Tennessee, they continued on to North Carolina. Danser checked into a room at the Lighthouse Motel in Carolina Beach sometime on April 24. Danser had been to that ocean side town, and, if fact, to that very same motel, during other vacation trips to the area. During the morning of April 25, 1998, a videotape was used to produce a visual depiction of Karen Doe and Danser engaging in sexually explicit conduct while in the bathroom and on a bed inside this room at the Lighthouse Motel in Carolina Beach, North Carolina. Danser checked out of this motel on April 25, 1998, and returned to Bloomington, Indiana with the videotape. That videotape, which is referenced in Count 1 of the Indictment, was transported in interstate commerce from Carolina Beach, North Carolina to Bloomington, Indiana on or about April 25, 1998. At the time the videotape was so transported back to Bloomington, Indiana from Carolina Beach, North Carolina, it contained visual depiction of Karen Doe engaging in the sexually explicit conduct described above with Danser. The scenes of the sexually explicit conduct on this videotape, a PAL 8mm, was then transferred to Exhibit 20A. Danser then destroyed the 8mm PAL videotape in Bloomington, Indiana and retained a copy of the scenes of the sexual activity in VHS format.

Jennifer Danser saw a video camera inside Danser's truck before he and Karen Doe left on the trip to North Carolina. Danser stipulated that he took a PAL 8 mm video camera on the trip to North Carolina on or about April 23, 1998. Jennifer and David Danser owned a video store in 1997 and 1998 which contained

equipment that was capable of transferring video tapes in PAL 8 mm format to VHS and SVHS formats.

Karen Doe would testify that before going to sleep in North Carolina on April 24, the two engaged in sexual acts on the bed which Karen Doe had selected to sleep in for the night. There is no videotape confirmation of that activity. While Danser understands that Karen Doe would testify to this fact, he specifically denies that he engaged in sexual activity before going to sleep that evening. However, given the accuracy of her recollection and descriptions of the other sex related events, as corroborated by the visual and other physical evidence, her version of this occurrence is more credible.

Karen Doe also details that the next morning, before returning to Bloomington, Indiana, Danser videotaped the two "having sex" on the bed she slept in and videotaped the two in the bathtub "having sex" which included her sucking on Danser's penis. The corroborative proof of her account of the morning's events is irrefutably recorded on Government Exhibit 20A.

According to the Defendant's testimony, the purpose of the North Carolina trip was quite innocent. In a voice wrought with emotion, he testified that the motive behind the trip was an opportunity to show his adopted daughter the ocean, one of the wonders of nature for which he has great affection. According to him, she had led a rather deprived and backwards lifestyle until he came into her life and he was trying to make up for lost time. As it turned out, the Danser defense contends, the fact that sexual acts occurred in the North Carolina motel room was merely a coincidental occurrence during the otherwise innocently motivated trip.

Danser explains that he is a camera buff and that he always has a camera with him, including in his vehicle, in case he has some use for a camera at any given moment. He explained that he had numerous video cameras and in addition to using them for videotaping Karen Doe for sexual purposes, he had used them to videotape her in normal childhood activities. Thus, he asserts, there was no special or planned purpose in taking the video camera to North Carolina.

However, a detailed consideration of the trip indicates that the sexual molestation did not just happen, but rather, that it played an important part in motivating the trip.

This trip was carefully structured so only Karen Doe and Danser would be on it. Danser announced that the trip was going to take place after Jennifer Danser had planned a trip related to Canada for school band activities for all of the other members of the household. Danser announced it as a trip to Disney World in Florida. Upon hearing this, Danser's son, Carson Doe, expressed an interest in going on that trip rather than the band trip. Danser then announced that the Florida trip could not be made for financial reasons. Carson then recommitted to the Canada trip. Near the last minute, Danser then re-established the trip so that only he and Karen Doe could participate in it. The trip came at a point in time when Danser and Karen Doe were frequently having sexual contact, to the point that if they were alone together, it was more likely than not that he would make some sexual use of her.

It is also interesting to note that Danser used a still camera to photograph innocent scenes of Karen Doe at the beach, some of which photos, after development, were later intermixed with a display of nude still photos of her taken at earlier times. However, it appears that the only use made of the video camera during the trip was for photographing the sexual activity. He also used a video camera which could be converted to the VHS format in a private area of his store, away from the prying eyes of other members of his household.

It is also evident from viewing the other videotaped scenes of the molestations on Exhibits 20 A, B and C, and considering

other evidence about them, that the sexual activities in the Danser home were conducted under less than ideal circumstances for Danser's purposes. First, they were subject to the potential interruptions from Jennifer Danser or other members of the Danser household. It is notable that during the videos shot in the Danser home, Danser speaks in rather hushed tones and he is also careful to, so to speak, "clean up" Karen Doe and the area of the molestations, such as Danser's bed, promptly after ejaculation so that the indicia of these molestations would not be visible to others, thus confirming the covert nature of his molestations of Karen Doe in that location. Of course, Danser's counsel argues, if the rest of the family was off in Canada on the band trip, Danser would be free from such interruptions and possible detection. However, that ignores the other potential interference to Danser in the Bloomington area, that is, his video rental business. In one of the videos made in Bloomington, Karen Doe can be heard to be pleading to go to the movies with Danser as she is required to masturbate him. Danser's response is to defer the requested favor because of his responsibilities at the video store. Far away in North Carolina, those business distractions would not be present, nor would the potential prying interruptions of neighbor visits, Karen's young swimming companions (who Danser had surreptitiously videotaped while changing clothes) or deliverymen. Additionally, Danser could reward Karen Doe for her performances in North Carolina by taking her to new and unusual sites, such as the beach, and he could do so in public away from the prying eyes of those who knew him or Karen. At Carolina Beach, he could also do these things at a location where Danser felt comfortable, because he had vacationed there on previous occasions so he knew the level of privacy he would have at the motel. He also would be in an atmosphere, that is, near the sea, a location which has special meaning for him. He hoped to cause similar feelings in Karen Doe for the ocean, perhaps to connect these particular episodes in her mind with the pleasant surroundings of an ocean side town. Not only could this be useful in the present, but also in the future as he might dangle the promise of another ocean visit before her as a reward for something he wanted her to do, or to associate the requested activity with something pleasant. He would also not have to share the treats (or rewards) he would be providing Karen Doe with Carson Doe or other members of the household. Everything done at Carolina Beach for Karen would be specially done for her alone.

Danser's counter to this is that he continued to check on his business, even while in North Carolina, and that it was the abandonment of the store by a careless employee that caused him to cut the trip short, so he still suffered business related distractions. This may be true, but the calls made about the video business only went one way, that is, from Danser to Bloomington, not the other way around. Danser controlled when the calls were made rather than being subject to receiving random or unexpected telephone calls. It is also noteworthy that the trip did not end until after the sexual videotape was completed and not until Danser had satisfied himself with Karen Doe, yet Danser learned of the problem with his business the preceding evening and confirmed that his store had been abandoned during a call to a neighboring pizza shop by midnight or 1:00 A.M. Rather than heading directly back to Bloomington, Danser awaited the completion of the next morning's molestations before starting back. He also didn't take Karen sightseeing until after she had completed her sexual duties for him.

It is also significant that in taking the PAL 8 mm camera that he did, he made sure that it had film and that it would work in the available light. The filming done in the motel room was not just coincidental, such as might have happened if Danser had accidentally left the camera running after they had come in from the beach. To the contrary, the camera is

carefully positioned and repositioned to capture the vivid details of the sexual exploitation. Danser also carefully positioned himself and Karen Doe several times to insure that he was capturing what he wanted to preserve of the molestations. Also, Danser contends that the video camera was just casually kept in the truck as a matter of course, as if by default. If that is the case, it would seem peculiar that it would be significant enough for Jennifer Danser to remember its presence at the time of Danser's departure from Bloomington. Nonetheless, the camera did not remain unnoticed in the truck upon their arrival in North Carolina. It had to be brought into the motel room, positioned, perhaps checked for film and lighting and activated. The court also infers that Danser checked the positioning and functioning of the camera before the filmed molestations began. Otherwise, he could not have achieved such an accurate record of his activities. For example, the shower scene appears to be carefully staged so that the camera was able to clearly capture all of the illicit activity without blocking from such things as doors or shower curtains. The camera would have to be carefully positioned to do that and it might require a check of the viewing provided by the camera to insure that the view of the area where the molestation is to occur is clear and accurate.

The scenes filmed in the motel are also somewhat different in content from any of the other scenes captured on Danser's other "home" collection videos, Exhibits 20 B and C (and the portion of 20 A that was filmed in Bloomington). None of the other videotaped encounters have shower scenes and none have lighting, camera, bed and body positions just like the North Carolina scenes and none have the same lurid dialogue. Although some of the North Carolina scenes are similar to other videotaped episodes, the North Carolina tape is not redundant.

There is no evidence that Danser filmed anything else with the PAL 8 mm camera during the trip, or that he filmed anything else but the North Carolina sex scenes on the disk, cassette, roll or container of film which contained the sex scenes. Perhaps he took some innocent footage while on the trip or with the same container of film. Regardless, it is only the sex scenes that he preserved from the PAL 8 mm film by transferring them to a VHS tape before destroying the PAL 8 mm film. If those events were only incidental, it would have been less likely that he would have filmed them in the first instance—at least one of the Bloomington molestations had not been filmed—and even less likely that he would have chosen them to be the only things that he preserved from the PAL 8 mm film. This suggests that the sex was an important part of the trip.

It is reasonable to infer from the video that Mr. Danser went to some effort to take his video camera with them on the trip and to position it to capture the illicit activity. It can also be inferred that he deliberately retained the videotape of that conduct and returned to Indiana with it. All of this is significant evidence from which it could be concluded that the purpose of the trip was the sexual activity with Karen Doe.

The sexual events also consumed a large part of the time spent during the North Carolina part of the trip. Danser testified that they visited the beach and "Captain Cook's ship" but those things seemed to take a very small part of the time spent there. They checked into the motel, Danser molested Karen Doe, slept, and then molested her again multiple times, and only then made short side trips to the beach and the ship before returning to Bloomington. Even though Danser testified that it was concern about his business that brought him back to Bloomington early, his concern about that peaked late on the evening of the 24th or early in the morning of the 25th when he confirmed through a pizza parlor near his store that his night clerk had abandoned the store. Despite that concern, he did not start the

return trip to Bloomington until he had completed the filmed sex acts the next morning. It seems as though it was important to Danser to get that done before he left the comfort of the his beloved North Carolina setting, even though he professed to having business worries.[2]

During the trip back to Indiana, according to Danser, Karen Doe asked that the sexual activity between them end. He swears that it did end then. However, about a month later, the difficulties which have resulted in this trial began for Danser when Bloomington and Monroe County law enforcement officers burst into the Bloomington motel room early on the morning of May 20, 1998, where Danser and Karen Doe, both nude, were found. As indicated during the hearing on the motion to suppress, a series of interviews and searches by law enforcement followed which resulted in the acquisition of certain evidence which will be discussed below.

The videotapes which are labeled as Exhibits 20A, 20B, and 20C, contain visual depictions which were produced using materials which have been mailed or shipped or transported in interstate of foreign commerce. The companies which manufactured these videotapes, namely, FUJI and BASF, made them outside the State of Indiana, and by their subsequent presence in the State of Indiana, these videotapes must have been shipped or transported in interstate or foreign commerce before arriving in Bloomington, Indiana.

On May 22, 1998, law enforcement officers recovered a brown box (Exhibit 20) from a concealed location with David and Jennifer Danser's video store located in Bloomington, Indiana. Law enforcement officers determined that this box contained

Exhibits 20A, 20B, 20C, 20D, 20E, 20F, 20G, 20H and 20I.

On May 20, 1998, law enforcement officers recovered a large, dark brown box (Exhibit 21) from within a motel room in Bloomington, Indiana immediately after David Danser's arrest. Law enforcement officers determined that this box contained Exhibits 21A, 21B, 21C, 21D, 22, 23, and 24.

Before his arrest on May 20, 1998, Danser stored several Old Spice containers, in a hidden location within his garage. Danser stored, within these containers, numerous 35mm negatives which depicted nude children and children engaging in sexually explicit conduct, Exhibits 20F and 20G.

Exhibit 20G is a group of developed negatives of Kodak film which were found in Old Spice containers (Exhibit 20F) inside the brown box recovered from David and Jennifer Danser's video store on May 22, 1998. Exhibit 20G contains visual depictions which were produced using materials which have been mailed or shipped or transported in interstate or foreign commerce. The company that manufactured the film for these negatives, namely, Kodak, manufactured this film outside the State of Indiana. Exhibit 20G contains depictions of Karen Doe and other persons.

Exhibit 20D is a group of developed negative of Kodak film which were found inside the brown box recovered from David and Jennifer Danser's video store on May 22, 1998. Exhibit 20D contains visual depictions which were produced using materials which have been mailed or shipped or transported in interstate or foreign commerce. The company that manufactured the film for these negatives, namely, Kodak, manufactured this film

2. Danser's claim that his business concerns caused an early end to the trip did not ring true. It is more likely that he was able to use that problem as an excuse to Karen Doe for bringing an early end to the trip. It would be much more understandable to a 7 year old than telling her that he had accomplished what he wanted by filming the morning sex ritual. It makes a much better story for her. Her hopes for some unusual scenery at the beach were fulfilled and his sexual escapade was safely in the PAL 8 mm camera for his future review at his leisure. If his business concerns were so pressing, the sex and/or the side trips would have been forgone.

outside the State of Indiana. Exhibit 20D contains depictions of Linda Doe.

Exhibit 20E is a roll of undeveloped Kodak film which was found inside the brown box recovered from David and Jennifer Danser's video store on May 22, 1998. Exhibit 20E contains visual depictions which were produced using materials which have been mailed or shipped or transported in interstate or foreign commerce. The company that manufactured this film, namely, Kodak, manufactured it outside the State of Indiana. Exhibit 20E contains depictions of Karen Doe and Linda Doe.

Exhibit 20I is a roll of undeveloped Kodak film which was found inside the brown box recovered from David and Jennifer Danser's video store on May 22, 1998. Exhibit 20I contains visual depictions which were produced using materials which have been mailed or shipped or transported in interstate or foreign commerce. The company that manufactured this film, namely, Kodak, manufactured it outside the State of Indiana. Exhibit 20I includes depictions of Karen Doe and Danser.

### B. OTHER EVIDENCE RELEVANT TO THE INSANITY DEFENSE

As noted, Danser testified that on the return trip from North Carolina to Bloomington, Indiana, Karen Doe told him that she wanted their sexual activity to stop and that he agreed to stop this activity. He also testified that he did stop it, including all videotaping of Karen Doe. This voluntary termination of the illicit activity parallels the end of a sexual relationship Danser had experienced with a young boy, James Doe, some years earlier.

James Doe was born on December 27, 1979. During the time James Doe lived in Fairmount, Indiana, and later in Bloomington, Indiana, he and Danser engaged in sexual acts with each other. This conduct began when James Doe was in the third grade and continued until he was at least 10 or 11 years of age. This sexual conduct included oral sex. Danser also had James Doe use sexual aids / devices on himself. After several years of this activity, when James Doe requested that the sexual encounters stop, Danser terminated the activity. Danser has an adult son from a previous marriage. Danser never fondled this son or engaged in sexual acts with him while this son was a minor. He also fathered a son with his wife, Jennifer, and there is no indication that he has molested that boy.

Danser concedes that he knew that his sexual activity, including the lascivious photographs, was illegal. In fact, as he put it, he was constantly looking over his shoulder so he would not be caught. He also admitted that during the time of the offenses on trial, he recognized that the majority of society considered his conduct as immoral. He even counseled a man he shared his interest in child pornography with, Pirie Cleveland, about the illegality of certain photos that Cleveland had delivered to Danser for processing.

Danser went to great lengths to conceal his illicit activities from all others except Karen Doe. According to Karen Doe, shortly after she began to live with the Danser's, and during or just after the two, in her words, "had sex," Danser told Karen Doe not to tell anyone that they were having sex. Danser testified that he told his wife about the early fondling of Karen Doe but that he had kept everything about the more lascivious sexual contact from Jennifer. Karen Doe never heard Danser tell Jenny Danser about them "having sex" and Karen Doe did not tell Jenny Danser about this until after Danser's arrest. In contrast to his secrecy about the situation with Karen Doe, Danser also testified that earlier in their marriage, his wife had made a young girl and a young boy (James Doe) available to him for his sexual purposes and that she had watched him molest these children. There was no corroboration for this testimony other than the

stipulation that James Doe had been molested over a 2 or 3 year period of time.

When interviewed by Monroe County Sheriff's Department Detective Brad Swain shortly after his arrest, Danser admitted his shame, remorse and guilt about his conduct.

Jennifer Danser, Danser's wife, received several letters from Danser after his arrest on May 20, 1998. She had examined the handwriting in all of these letters (Exhibit 28) and recognizes that it belongs to Danser. Some letters were addressed to her. Some letters were addressed to potential witnesses in the current case, including Karen Doe, James Doe and others. Danser acknowledged during his trial testimony that he had written the letters. The letters contained a number of expressions of remorse, regret, sorrow and apology by Danser for the sexual conduct with Karen Doe. For example, on May 29, 1998 (about 9 days after his arrest), Danser wrote the following to Karen Doe from jail:

> [Karen], I felt like I had to write you about those things we did together. You know sex stuff. I'm sorry I allowed that stuff to start. I hope you can forget it all real soon + just be a kid. Stay away from sex for now, be a kid. There will be a time in your life, when you're much older that it may be OK to do sex stuff, but not now.
>
> You did the right thing telling Mommy + that lady about it. We shouldn't have been doing it anyway.

In a letter to his wife in September 1998, again, from jail, Danser wrote:

> You have no idea how this is effecting (sic) me. First there is the knowledge of why I'm here. I'm so embarrassed (sic), ashamed, disgraced, hurt, remorseful, I can hardly bear it. I cry daily. I feel so badly for my family, and friends it is overwhelming...Weather (sic) we get back together or not, I agree that I

have done wrong. Believe that I am sorry as I can be. Believe that I will never again get myself in a position where I can hurt another as I have ever again. Believe I shall seek help with my problems and do my best to make up all I have harmed.

He made similar expressions under oath in this court during the hearing on the motion to suppress, even to the point of admitting that he knew what he had done was wrong.

However, during interviews with Psychologists Albert Fink[3] and Ronald Riggs[4], Danser expressed his view that although he recognized the illegality of his actions, at the times he committed them, he felt that they were not wrong in the moral sense. He even debated the issue with Dr. Fink, who had difficulty conceiving that anyone could express the view that the type of things Danser did to children was morally appropriate. At trial, Danser's testimony emphasized that he always recognized the illegality of his activities but that he never considered them to be immoral. The defense portrayed his earlier testimony and statements reflecting shame, regret and recognition of wrongfulness as an indication of his concern that his family had suffered because of his arrest and not an acceptance of the moral depravity of his actions.

One other aspect of Danser's interview with Detective Brad Swain bears discussion. At several points during the first interview on May 21, 1998, Danser initially denied certain conduct, or minimized the nature or extent of the conduct. Only later did he admit the conduct. This is perceived as an effort to downplay his criminality and to avoid detection of certain aspects of his conduct, if possible. For example, at page 4 of the transcript of that interview, Danser is quoted as saying:

> There is not a, and there is no place in any of my stuff that you'll actually find a

---

3. Dr. Albert Fink, Ph.D., is a Psychologist employed by the defense.

4. Dr. Randall Rigg, Ph.D., is a Bureau of Prisons Psychologist.

pornographic picture of a child that was, you know, that was in, involved in a...in a sexual thing, in any of these pictures. In fact, he had dozens of such photographs. He is asked directly at page 37 whether he has any other pornography any where and he responds "No, I don't think so," completely ignoring the extensive cache at his video store which he does not reveal until the next day. When asked at page 6 about his feelings toward young boys, he describes it as "a very, very small side interest" when in fact he molested James Doe frequently over an extended period of time. When asked at page 9 about his sexual involvement with Karen Doe, he stated that it had only happened "so few times." When asked if he had videotape of any of his sexual encounters with Karen Doe, he denied it at pages 17 and 18, though he conceded that he did at one time in the past. He professed to be afraid of possessing such a videotape and indicated that he had destroyed it by taping over it. Clearly, these statements were untrue. When asked about the "loot" reference in the note directing destruction without viewing found in his wallet, he stated that "loot" referred to money, when in fact it referred to his illegal pornographic collection. At page 20, Danser appears to be trying to persuade Swain that all of his incriminating photographic materials had been with him at the motel. When asked about his sexual contact with James Doe at page 29, he also minimized the extent of it, saying that it only lasted for a short while, just once or twice, and then only every couple of months. When asked about the sex toys at pages 30 and 31, Danser indicates that Karen Doe saw them but implies that they were not used as a part of their sexual activities. Again, that is refuted by the videotape evidence. It is not until the next day, when he has hopes of implicating his wife in criminal wrongdoing to prevent her from gaining

an advantage over him in the marital dissolution, does he disclose the existence and location of the most incriminating photographic evidence.

There are four lynchpins to the Defendant's insanity defense: the Defendant's statement of his personal moral code; Dr. Fink's assessment of the Defendant's mental state; his assessment of the accuracy or credibility of the Defendant's statement of his moral beliefs; and, Dr. Fink's interpretation of the cause and effect of those stated moral tenets.

As the fundamental building block of this defense, the Defendant testified at trial that neither his conduct in creating and possessing the nude photographs (which he concedes constitute illegal child pornography) or the sexual contact with the minor girl was immoral. He referred to the photographs depicting explicit sexual activity with a minor and displaying her genital and pubic area in a sexual way as things of beauty which are aesthetically pleasing to him. He also testified that his sexual involvement with Karen Doe was not morally wrong and was not harmful to her. Aside from the illegality of the conduct, which he recognized, he testified that he finds nothing wrong with it. He conceded that the majority of the society in which he lives finds this conduct to be morally repugnant, but contends that he doesn't and that he cannot understand why others share in the majority view. His testimony on these things was given in the sense that these were matters of present and long standing belief. Apparently he also espoused these views when he was interviewed by Dr. Fink and at least to some degree when he spoke with Dr. Riggs.

Based on his examination and testing of Danser, Dr. Fink testified about his assessment of Danser.[5] Dr. Fink diagnosed

5. There was a fair amount of sparring at trial between the prosecution and the defense about whose psychological examination was the better of the two. Both Dr. Fink and Dr.

Randall Riggs, administered an MMPI–2 (the current version of the Minnesota Multiphasic Personality Inventory) to the Defendant. They also conducted several interviews of him

Danser to be suffering from a mental defect, specifically pedophilia. At one point in his testimony, Dr. Fink referred to pedophilia as a "reflection" of a mental defect. Later on, he describes pedophilia as the defect itself. He also described the "investigations" or techniques that he used to arrive at an assessment of Danser. These included a review of the historical records of any mental disorders, a review of at least some of the investigative materials related to the charges in this case and interviews with the Defendant himself. Dr. Fink referred to a famous psychologist who referred to this as "detective work," involving various clues that can take one in many directions. One of the largest clues, Dr. Fink seemed to feel, was the MMPI–2 results. Initially, Dr. Fink noted that he felt comfortable that the results of the MMPI–2 that he administered to Danser were valid, principally because of the validity scale results, which indicated a lack of malingering on Danser's part, that is, that he was giving honest responses to the MMPI–2 questions. What Dr. did with that validity measure bears some discussion, though. From that indication of validity in the MMPI–2 testing, Dr. Fink presumed credibility on Danser's part in their other interactions. As will be discussed, that may have been a naively mistaken premise.

He then went on to categorize Danser's pedophilia as a "severe" mental defect. He based that on a number of factors, including what he found to be chronic pedophiliac behavior, going back to his adolescent years. He also considered what he called frequency of the behavior, which he called dominant in Danser's thinking over the 5 to 7 years leading up to his arrest. He also found an intensity in the behavior which he felt was interrelated to the frequency. Despite Dr. Fink's criticism of the Diagnostic and Statistical Manual of Mental Disorders (Fourth Edition) (DSM–IV) as a classification system, he testified that as that guideline defines severe, Danser's pedophilia was a severe mental defect. More about this conclusion later.

Then, returning full circle, Dr. Fink related his observations about discussions he had with Danser about the Defendant's belief system. Dr. Fink candidly admitted his anger at the expressions of unusual moral views by Danser. He felt it demonstrated a thinking problem or disorder. Dr. Fink noted that it was his view that a common characteristic of pedophilia is a belief system that allows them to feel what they are doing is morally all right. He did qualify that by conceding that there is a great deal of manipulation and rationalization by some pedophiles so that it is difficult to sort out whether that is a true belief or not. He does opine, though, that Danser did believe that what he did with Karen Doe was morally permissible. When asked by Danser's counsel to explain what in forensic psychology allows him to draw a conclusion about a person's state of mind at the time of the commission of a crime, he describes it as sort of an intuitive product of a review of a variety of evidence surrounding the person as a part of their

and examined various documents, photographic images, interviews and other materials related to the charges. The overall manner of examination of the Defendant by Drs. Fink and Riggs was not substantially different. Counsel jousted about the scoring method of the MMPI–2, the extent to which the videotapes of the sexual molestations were viewed and perhaps the depth of the interviews with Danser. None of that made a material difference in the court's view of the psychological testimony. What was important were some of the similarities. Specifically, the results of the two MMPI–2's were very close. Also, the respective diagnoses of the condition suffered by Danser, pedophilia, is comparable. Of course, Dr. Riggs also determined Danser to be suffering from a personality disorder not otherwise specified but this does not otherwise affect his opinion on the critical questions on the sanity issue. Of course, the defense and prosecution psychologists reached different conclusions on the elemental points which underly the ultimate sanity question that the court must decide. To the extent that their testimony was at variance on material points, it will be discussed in this entry. To the extent variances are not discussed, the court did not consider them to be material.

"style", including things they have said, correlating evidence such as the MMPI and in the end, reaching a sense as to whether the person is rationalizing or whether that is what they really believes. As for Danser, Dr. Fink opines that he had "overwhelming data" that it was more likely than not that he was being honest about this permissive moral belief system. Of special importance to Dr. Fink was the statements Danser made to him in the beginning of their conversations about the correctness of his conduct with Karen Doe. When asked about whether hiding the behavior indicates that the actor knows that it is wrong, Dr. Fink said that it did not necessarily mean that, and that sex performed behind closed, locked doors is not necessarily performed with knowledge of its wrongfulness. Dr. Fink attributes Danser's present condition, at least in part, to child abuse that he experienced in his youth.

Dr. Fink did not fare so well on cross examination. He acknowledged awareness of Danser's expressions of regret, remorse, apology and acknowledgment of wrongdoing in his correspondence to Karen Doe and his wife. He also conceded that those things were written about a year before he began his assessment of Danser. He was also confronted with the statements made to Detective Brad Swain during the post arrest interviews in which Danser expressed remorse, regret and sorrow about his conduct and an acknowledgment of wrongdoing.[6] Dr. Fink discounts these statements, though, as not reflecting Danser's true beliefs, but rather, they are things he said to minimize the harm he would suffer from being caught by the authorities—sort of a survival technique. He also expressed his awareness of Danser's efforts to hide the offending child pornography materials. With respect to his diagnosis of pedophilia, Dr. Fink equivocated about whether he was using the

DSM–IV definition of pedophilia but confirmed that there were no substantial difference between his use of the term and the DSM–IV definition. He further acknowledged that the diagnostic criteria of DSM–IV for pedophilia include recurrent intense fantasies, sexual urges or behaviors involving children, which sounds somewhat similar to the characteristics of frequency, intensity and chronicity that he utilized in assessing the pedophilia as a severe mental defect. It appears that he is just using the diagnostic criteria to characterize the condition as severe. Dr. Fink's explanation is, though, that these factors were present in Danser's case in especially strong form. He acknowledged the DSM–IV criteria for severity (several symptoms in excess of those required to make the diagnosis and symptoms markedly interfering with occupational functioning or with usual social activities or relationships with others) and indicated that none were present in Danser's case except social dysfunction within his family unit. Even that determination is suspect, based solely on self reporting by Danser. It ignores the long standing nature of his marital relationship and the normal-to-the-appearance nature of that family which allowed the adoption authorities to proceed with the completion of the adoption of Karen Doe. It also does not address the fact that he has never molested his natural children, only step- or adopted children within the family unit. However, he conceded that he had not obtained any numerical information about the frequency of pedophiliac sexual behaviors or fantasies by Danser during the relevant time period. When asked about whether Danser had admitted to attraction to young boys, Dr. Fink indicated that he had not and that he had told him about just one or two sexual encounters with James Doe, rather than the years of their involvement.

---

**6.** Specifically, Danser referred to his sexual preference as "probably the most taboo...in society," and said such things as that he prayed to keep the contact with Karen at fondling, that his preference was a curse, that he was sad about his conduct and that he wishes that a leash could be put on him to prevent him from doing it.

During questioning by the court, Dr. Fink acknowledged that it is not generally accepted in the field of psychology that pedophilia causes an inability to appreciate the wrongfulness of the conduct. He readily admitted that his assessment of Danser in that regard was unique to Danser and would not apply to the larger group of individuals who would be considered as suffering from pedophilia. He considered Danser's testimonial expressions of wrongfulness, shame and remorse as a recent conversion to an acceptance of this view and not a reflection of his beliefs at the times of the offenses. Dr. Fink was not aware that Danser had ever expressed or espoused his "child love" morality to anyone other than the psychologists and his attorneys after his arrest.

As might be expected, Dr. Riggs on behalf of the government starts from some of the same points but ends in a very different place. As previously noted, Dr. Riggs finds Danser to suffer from pedophilia, a mental "disease" rather than a defect. He also determined Danser to be suffering from a personality disorder not otherwise specified but this does not otherwise affect his opinion on the critical questions on the sanity issue. In stark contrast to Dr. Fink, Dr. Riggs keeps very close to the language and limitations of DSM–IV, finding little, if any, disagreement with it. For example, he agrees with DSM–IV that rationalization is a characteristic of pedophilia. With regard to severity, Dr. Riggs tows the DSM–IV line and finds that Danser's condition does not come close to meeting the DSM–IV guideline for severity. He considers pedophilia as a sexual disorder within the field of mental disorders and concludes that Danser suffers no mental disorder which impairs his ability to appreciate the wrongfulness of his conduct. This is all in the face of Danser having made statements to him professing his belief in the appropriateness of his sexual activity involving children. Contrary to Dr. Fink's view, Dr. Riggs does not believe that genuine belief in the morality of sexual involvement with children is characteristic of pedophilia and he contends that this is the general view in psychology.

Overall, the court finds the foundation for the insanity defense to be about as solid as quicksand. On close scrutiny, the real core of this defense is the credibility of Danser's profession of his personal moral code. Dr. Fink testifies that he finds it to be credible and from that concludes that Danser's pedophilia is the cause of this odd conception of morality. When his opinions were tested by examination, though, it becomes apparent that it is not psychology that leads Dr. Fink to his conclusion, but rather, merely his personal opinions.

In assessing Danser's credibility during their sessions, what Dr. Fink has really done is simply transferred the validity scores he found on Danser's MMPI–2 to balance of their discussions. He says he looked to other things to test Danser's credibility but he couldn't have looked very hard or very far. He failed to note the significance in Danser's minimization of his conduct during the interview with Detective Swain. He failed to attribute any importance to Danser's falsification of the extent of his involvement with James Doe when he talked with Dr. Fink. He deeply discounted the expressions of regret, remorse and wrongdoing expressed by Danser in his interview with Detective Swain. As Dr. Fink explains it, that is just what a person in Danser's position would say when compelled to do so in such dire circumstances. However, this shallow analysis ignores contradiction posed by Danser's letters to Karen Doe and his wife after that interview which express these things with equal firmness. Dr. Fink denigrates Danser's testimony before this court as merely the product of an "educational process" which has caused him to now understand, at least in part, the immorality of his actions. Or, he explains, Danser may be in a remissive period of his pedophilia. Unfortunately, those views fall way short of the mark when Danser testi-

fies minutes after the completion of Dr. Fink's testimony that he still believes that his conduct with Karen Doe was perfectly all right. Either the "educational process" didn't take or the remission didn't last long—or the Defendant is not credible. Dr. Fink also failed to look closely at the covert nature of Danser's conduct in committing the molestations and in creating and collecting the child pornography. If Danser truly held these views on morality because of a mental defect, it is curious that he would share his views with no one, and that he would instruct Karen Doe not to disclose the activity even to her adopted mother.[7] Danser was so clever at concealing his conduct and preferences that adoption officials approved him for the placement of Karen Doe. Even when speaking with a "fellow traveler" (Pirie Cleveland), there is no indication that Danser espoused his views of the propriety of this conduct. To the contrary, he counseled Cleveland about the illegality of certain photographs. The first known disclosure of these views is during the interviews with Dr. Fink. That is simply too convenient to be credible. Dr. Fink suggests that Danser may have held this back because of a warning he received at an early age about the likelihood of arrest if he reported his attraction to children. That explanation falls away when the interview with Detective Swain is considered. Danser had been caught, literally, with his pants down. The evidence against him was overwhelming so he would not fear arrest because of an expression of theses views—his arrest had already happened and he conceded that he had no hope of innocence. When asked about how he felt about his conduct, Danser responded in terms that clearly reflected his appreciation of the immorality of his conduct.

Without belaboring the point, it seemed to the court that Dr. Fink's opinions lacked the support of sound psychological principles. What it comes down to is that he wants to believe that Danser held those views in the face of overwhelming evidence that he could not. Dr. Fink does not appear to believe that Danser could be less than honest with him on those points. All he really has to support that belief is the MMPI–2 validity scales. But accuracy and truthfulness in taking a psychological test does not insure truthfulness during the interviews. Dr. Fink also strays far away from the mainstream of thinking in the area of psychology in arriving at his opinions. He does so without any firm concepts of psychology or any tested methodology to arrive at the extreme he reaches. With respect to his assessment of the severity of the disease or defect, Dr. Fink made no reference to any sound psychological basis, and ignored the clear standards set forth in the DSM–IV. In the end, all he has are the words of Danser to support his conclusions. Dr. Fink does not address the dichotomy between Danser's clear recognition of the illegality of his actions and the public moral disapproval of it and his essentially unique personal views on the subject. He does acknowledges that this deficiency in morality is not characteristic of pedophilia, and rationalization is, yet he cannot explain why this is not merely rationalization in this particular case.[8]

---

**7.** Danser did testify that he shared his fondling molestations and some of the nude photographic activity with his wife, Jennifer. He also testified that he had openly molested two other children in her presence earlier in the marriage. Even if it is true that Jennifer was his confidant in these things, a great deal of the rest of his conduct was not shared with her. Nonetheless, this disclosure is still far short of a visible expression of his views on the morality of these acts.

**8.** To some extent Dr. Fink tried to use his testimony to further the great debate among psychologists about whether DSM–IV is an adequate classification system. Ironically, though, Dr. Fink probably uses DSM–IV daily in his work and he claims to use it as his starting point in his evaluation of Danser. However, he strays far from it in this case, and in fact contradicts it in order to reach his conclusions. It appear to the court that because DSM–IV did not fit well with an out-

In a fairly illustrative portion of his testimony on direct examination, Dr. Fink concludes that one of the characteristics of pedophilia is that a person suffering from it develops, over time, a shift in their value systems so that they come to believe what they are doing is right. He did candidly admit, though, that he had no proof to support that theory. He also believes that Danser, during the six weeks of his observations, did have some delusional thought patterns. The sole example of his delusional thought patterns is his stated believe in the appropriateness of sexual involvement with children. According to Dr. Fink, as a result of his pedophilia, Danser is unable to discern right from wrong in the area of sexual interest in children. With this analysis of cause and effect, the defense leaves it to the court to conclude that Danser must be insane. As this example shows, in the end, the testimony is nothing more than a bald, unsupported opinion which, although dressed in the cloak of psychology, is really of no help to the court.

And finally, as for Danser's credibility with respect to whether he truly held a

come the Dr. Fink wanted to reach, this fueled his criticism of it.

9. During closing argument, Danser's counsel stated that the court as fact-finder must draw all reasonable inferences in favor of the defendant, with the exception of credibility determinations. Upon questioning by the court, counsel stated that she did not have authority for this proposition, but it was her belief that it is the law.

Without any further guidance from counsel, the court believes she is referring to a line of Seventh Circuit cases that holds, "[w]here the evidence as to an element of a crime is equally consistent with a theory of innocence as a theory of guilt, that evidence necessarily fails to establish guilt beyond a reasonable doubt." *United States v. Delay*, 440 F.2d 566, 568 (7th Cir.1971); *see also United States v. Harris*, 942 F.2d 1125, 1129–30 (7th Cir.1991) (same; citing *Delay*); *United States v. Hirschberg*, 988 F.2d 1509, 1517 (7th Cir.1993) (Cudahy, J., dissenting in part) (same; citing *Delay*). This doctrine appears applicable when "the evidence is woefully inadequate" to establish an element of the offense. *Delay*, 440 F.2d at 568; *see also Hirschberg*, 988 F.2d at 1517

distorted view of morality that condoned his conduct underlying these charges, the discussion above demonstrates that the court does not find it to be lacking. The covert way in which he committed and concealed these acts, his response to detection of them, his communications to his wife and the victim, and all of the other things discussed in detail above lead inevitably to the conclusion that the view of morality he expressed to the psychologists was not his truly held belief during the time of the commission of these crimes. Even though Danser is correctly categorized as suffering from pedophilia, any thoughts he may have had about the appropriateness of his conduct were, at best, a rationalization he created which enabled him to live with himself while his did those things to innocent children.

## II. CONCLUSIONS OF LAW

### A. THE CHARGED OFFENSES

The Government has the burden of proving all elements of the charged offenses beyond a reasonable doubt.[9]

(indicating that the rule applies to "evidence ... that is rather unusual, if not unique."). As discussed herein, this case is not such a case.

This doctrine relates to the sufficiency of the evidence to support a conviction. When reviewing the sufficiency of the evidence, a court of appeals task is to determine "if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Furkin*, 119 F.3d 1276, 1280 (7th Cir.1997) (citation omitted); *see also Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). In so doing, the appellate court "review[s] the evidence and all reasonable inferences that can be drawn therefrom in the light most favorable to the Government." *Furkin*, 119 F.3d at 1280 (citation omitted). The clearly implies that in performing its duties, a 'rational trier of fact' has the power to 'draw all reasonable inferences in the light most favorable to the Government.' This implication could be seen as inconsistent with the doctrine stated in *Delay*, but this is not an appropriate case in which to embark on such an analysis since the court is not faced with

### 1. Count One

1. (a) A person who employs, uses, persuades, induces, entices, or coerces any minor to engage in any sexually explicit conduct for the purpose of producing any visual depiction of such conduct, (b) knowing or having reason to know that such visual depiction will be transported in interstate or foreign commerce·or mailed, or if such visual depiction has actually been transported in interstate or foreign commerce or mailed, violates 18 U.S.C. § 2251(a).

■ 2. For the purpose of 18 U.S.C. § 2251(a), a person "uses" a minor to produce child pornography if the minor serves as the subject of photography. *See United States v. Sirois,* 87 F.3d 34, 42 (2nd Cir. 1996).

3. For the purpose of 18 U.S.C. § 2251(a), "minor" means any person under the age of eighteen years. *See* 18 U.S.C. § 2256(1).

4. For the purpose of 18 U.S.C. § 2251(a), "sexually explicit conduct" means actual or simulated: sexual intercourse (including genital-genital, oral-genital, anal-genital, or oral-anal), whether between persons of the same or opposite sex; bestiality; masturbation; sadistic or masochistic abuse; or, lascivious exhibition of the genitals or pubic area of any person. *See* 18 U.S.C. § 2256(2).

### Conclusions Regarding Count One

■ 1. During the period between April 23, 1998 and April 25, 1998, Danser knowingly employed, used, persuaded, induced and enticed Karen Doe, a person Danser knew to be a minor, to engage in sexually explicit conduct in Carolina Beach, North Carolina, for the purpose of producing a videotape of such conduct, knowing or having reason to know that such videotape would be transported in interstate commerce or mailed, and such videotape having actually been transported in interstate commerce from Carolina Beach, North Carolina to Bloomington, Indiana. As discussed in the Findings of Fact, Danser went to great lengths to ensure: that he was alone with Karen Doe during the relevant time period; that he had a functional video camera with him in Carolina Beach, and specifically, in the Lighthouse Motel; that Karen Doe would be used as the subject of his pornographic videotape; that Karen Doe would be persuaded, induced and enticed (by promises of visits to the beach and other unusual sights) to engage in sexually explicit conduct with Danser in front of the video camera.

2. The evidence at trial proved beyond a reasonable doubt that Danser was guilty of the offense charged in Count One of the Indictment, a violation of 18 U.S.C. § 2251(a).

### 2. Count Two

1. A person who crosses a State line with intent to engage in a sexual act with a person who has not attained the age of 12 years violates 18 U.S.C. § 2243(a) (struck in 1998 by Pub.L. 105–314, § 301(b)).[10]

2. For the purpose of 18 U.S.C. § 2243(a) (as effective between 1996 and 1998), the term "sexual act" means: contact between the penis and the vulva or the penis and the anus (and for purposes of this subparagraph, contact involving the penis occurs upon penetration, however, slight); contact between the mouth and

circumstances where, as to any element of any charged offense, "the evidence as to an element of a crime is equally consistent with a theory of innocence as a theory of guilt."

**10.** The language in 18 U.S.C. § 2243(a), forming the basis of Count Two, was added in 1996 by Pub.L. 104–208, § 101(a). The language was then stricken on October 30, 1998 by Pub.L. 105–314, § 301(b), on the grounds of redundancy (presumably because 18 U.S.C. § 2241(c) had criminalized the identical conduct since 1996). *Cf.* 18 U.S.C. § 2241(c) ("Whoever crosses a State line with intent to engage in a sexual act with a person who has not attained the age of 12 years, ... shall be fined under this title, imprisoned for any term of years or life, or both.").

the penis, the mouth and the vulva, or the mouth and the anus; the penetration, however slight, of the anal or genital opening of another by a hand or finger or by any object, with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person; or, the intentional touching, not through the clothing, of the genitalia of another person who has not attained the age of 16 years with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person. *See* 18 U.S.C. § 2246(2).

3. The phrase, "with intent to engage in," as it is used in 18 U.S.C. § 2243(a),[11] means that engaging in a sexual act with a person under 12 years of age needs to be a "significant" or a "motivating" purpose for the travel across a State line; it need not be the most important of the defendant's reasons for travel, but it also cannot be simply an incidental one. *See United States v. Vang*, 128 F.3d 1065, 1071–72 (7th Cir.1997), *cert. denied*, 522 U.S. 1140, 118 S.Ct. 1107, 140 L.Ed.2d 160 (1998) (interpreting 18 U.S.C. § 2423(b), which forbids travel in interstate commerce "for the purpose of engaging in any sexual act (as defined in section 2246)" with a minor); *United States v. Snow*, 507 F.2d 22, 23 (7th Cir.1974) (interpreting a similar provision under the Mann Act); *see also United States v. Miller*, 148 F.3d 207, 212–13 (2nd Cir.1998); *United States v. Meacham*, 115 F.3d 1488, 1495–96 (10th Cir.1997); *United States v. Sirois*, 87 F.3d 34, 39 (2nd Cir. 1996); *United States v. Campbell*, 49 F.3d 1079, 1082–83 (5th Cir.1995); *United States v. Ellis*, 935 F.2d 385, 389–92 (1st Cir.1991).

### Conclusions Regarding Count Two

■ 1. On April 23, 1998, Danser traveled from Indiana to North Carolina with intent to engage in a sexual act with Karen Doe, a person Danser knew to be below the age of 12 years. As discussed in the Findings of Fact, engaging in sexual acts with Karen Doe was a dominant, significant and motivating purpose for the travel to North Carolina. This conclusion is supported by inferences from Danser's acts committed before, during and after the travel. Before the travel, Danser carefully structured the trip to North Carolina so only Danser and Karen Doe would be on it; he packed the video camera in anticipation of filming the sexual acts involving Karen Doe; based upon his prior experience, he knew the Carolina Beach locale presented rewards that he could promise to Karen Doe for her performance of sexual acts, and freed Danser from the threat of interruptions and business distractions. While in Carolina Beach, the sexual acts involving Karen Doe constituted a large part of the overall time spent during the North Carolina part of the trip; upon learning of a business emergency in Indiana, Danser did not begin driving home at the first opportunity—he instead engaged in a variety of sexual acts involving Karen Doe; Danser took Karen Doe for trips to the beach and "Captain Cook's ship" only after they had engaged in sexual acts multiple times. After returning to Indiana, Danser went to the effort of copying the PAL 8 mm videotape to a VHS format videotape, destroying the PAL 8 mm tape and carefully hiding the VHS copy within a wall in his business.

2. The evidence at trial proved beyond a reasonable doubt that Danser was guilty of the offense charged in Count Two of the Indictment, a violation of 18 U.S.C. § 2243(a), as in effect in April 1998.

### 3. Count Three

1. (a) A person who knowingly possesses three (3) or more books, magazines, periodicals, films, video tapes, or other matter which contain any visual depiction

---

11. The court can find no case law interpreting this portion of the statute as it was worded between 1996 and 1998. However, both parties rely upon case law interpreting statutes with very similar provisions, 18 U.S.C. § 2423 and provisions of the Mann Act. The court finds this analogy appropriate and similarly relies upon such cases.

(b) that has been mailed, or has been shipped or transported in interstate or foreign commerce, or which was produced using materials which have been mailed or so shipped or transported, by any means including by computer, (c) if the producing of such visual depiction involves the use of a minor engaging in sexually explicit conduct; and, (d) such visual depiction is of such conduct, violates 18 U.S.C. § 2252(a)(4)(B).[12]

2. For the purpose of 18 U.S.C. § 2252(a), "minor" means any person under the age of eighteen years. *See* 18 U.S.C. § 2256(1).

3. For the purpose of 18 U.S.C. § 2252(a), "sexually explicit conduct" means actual or simulated: sexual intercourse (including genital-genital, oral-genital, anal-genital, or oral-anal), whether between persons of the same or opposite sex; bestiality; masturbation; sadistic or masochistic abuse; or, lascivious exhibition of the genitals or pubic area of any person. *See* 18 U.S.C. § 2256(2).

### Conclusions Regarding Count Three

■ 1. On or about May 22, 1998, Danser knowingly possessed three (3) or more films, video tapes, or other matter which contained visual depictions involving the use of minors engaging in sexually explicit conduct and which was produced using materials which have been mailed or shipped or transported in interstate commerce. Such matter includes: Exhibits 20A, 20B, 20C (videotapes), and Exhibits 20D, 20E, 20G, and 20I (film), all of which were recovered by law enforcement officers at Danser's video store in Bloomington, Indiana on May 22, 1998.

2. The evidence at trial proved beyond a reasonable doubt that Danser was guilty of the offense charged in Count Three of the Indictment, a violation of 18 U.S.C. § 2252(a)(4)(B), as in effect in April 1998.

## B. AFFIRMATIVE DEFENSE— INSANITY

1. It is an affirmative defense to a prosecution under any Federal statute that, (a) at the time of the commission of the acts constituting the offense, the defendant, (b) as a result of (c) a severe (d) mental disease or defect, (e) was unable to appreciate the nature and quality or the wrongfulness of his acts. Mental disease or defect does not otherwise constitute a defense. *See* 18 U.S.C. § 17(a) ("Insanity defense").

■ 2. The defendant has the burden of proving the defense of insanity by clear and convincing evidence. *See* 18 U.S.C. § 17(b).

■ 3. "Insanity" under 18 U.S.C. § 17, is a legal term. The inquiry is not whether a defendant is insane by psychiatric or psychological standards. Rather, the inquiry is only whether a defendant has established insanity as defined by 18 U.S.C. § 17. Whether a defendant has proven that he was legally insane at the time is a question to be decided by the trier of fact. *See United States v. Reed,* 997 F.2d 332, 334 (7th Cir.1993); *see also United States v. Shlater,* 85 F.3d 1251, 1257 (7th Cir.1996); *United States v. Brown,* 32 F.3d 236, 240 (7th Cir.1994).

■ 4. A defendant's attempt to conceal his commission of a crime can suggest that he knows the action is wrongful. *See United States v. Hiebert,* 30 F.3d 1005, 1007 (8th Cir.1994); *United States v. Barton,* 992 F.2d 66, 69 (5th Cir.1993); *United States v. Freeman,* 804 F.2d 1574, 1577 (11th Cir.1986).

■ 5. Evidence that a defendant, after his arrest for the charged crime, apologizes for his actions and the problems he has caused, can suggest that the defendant could appreciate the nature and quality

---

**12.** In 1998, pursuant to Pub.L. 105–314, § 203(a)(1), Congress struck out "3 or more" each time it appeared in 18 U.S.C. § 2252(a)(4) and replaced in with "1 or more."

and the wrongfulness of his conduct. *See Barton*, 992 F.2d at 69; *see also Freeman*, 804 F.2d at 1577.

■ 6. Evidence that a defendant knew that the charged behavior was illegal can suggest that the defendant understood that his criminal behavior was wrong. *See United States v. Reed*, 997 F.2d 332, 334 (7th Cir.1993) ("But the evidence was overwhelming that, although he may have suffered from a mental disorder, Reed did not fail to understand that his criminal behavior was wrong.... Dr. Chapman[ ] acknowledged that Reed may have known when he robbed the bank that such behavior was illegal.").

7. The word "wrongfulness" in the insanity statute (18 U.S.C. § 17) is not further defined. In order to encompass the theory raised by the defense, the court needs to examine possible meanings of this term. The meaning of the word "wrongfulness" in this context could rest at some place on a spectrum that covers three possible definitions. First, the word may mean legally wrong, or "contrary to law."

Under this definition, a defendant does not meet his burden under 18 U.S.C. § 17 if he was able to appreciate that his act violated the law. Second, the word may mean "contrary to public morality." Under such a meaning, a defendant does not meet his burden under 18 U.S.C. § 17 if he was able to appreciate that society morally condemns his acts. Third, the word may mean "contrary to one's own conscience." Under this entirely subjective approach, the defendant meets his burden under 18 U.S.C. § 17 if he proves to the fact finder by clear and convincing evidence that, because of mental disease or defect, he believed that he was morally justified in his conduct even though he may appreciate either that his act is criminal or that it is contrary to public morality. *See United States v. Segna*, 555 F.2d 226, 232 (9th Cir.1977) (analyzing the insanity defense under the American Law Institute ("ALI") definition of insanity). Of course, the precise meaning of "wrongfulness" could encompass more than one of these three definitions, and/or lie somewhere in the realm between them.[13]

13. From the court's review of the case law, the only court to expressly adopt this completely subjective definition of "wrongfulness" is the Ninth Circuit in *Segna. See* 555 F.2d at 232–33. In so holding, the *Segna* court chose from two possible meanings of the word "wrongfulness" discussed in the text accompanying the Model Penal Code's ("MPC") definition of insanity. That text is ambiguous as to whether the drafters intended the moral element of "wrongfulness" to be measured by a defendant's capacity to understand society's moral standards or his own personal moral standards. The MPC Commentaries suggest the awareness that the word could be interpreted either way: at one point the Commentary says, "[a]ppreciating 'wrongfulness' may be taken to mean appreciating that the community regards the behavior as wrongful," I MODEL PENAL CODE § 4.01, comment 3 at 169; but shortly thereafter, the Commentary refers to "where the wrongfulness standard is taken to refer to the actor's own moral perception...." *Id.* In his model jury charge, Professor Wechsler, the Director of the ALI at the time, seems to advocate a definition of "wrongfulness" that means 'contrary to public morality' by suggesting the following language: "[A] person may have knowledge of

the facts about his conduct and of the immediate surrounding circumstances and still be rendered quite incapable of grasping the idea that it is wrong, in the sense that it is condemned by the law and *commonly accepted moral standards.*" I MODEL PENAL CODE § 4.01, appendix C, p. 214 (emphasis added).

The court has doubts about whether *Segna*'s holding would still be considered valid if reconsidered today, in light of the intervening passage of the Legal Insanity Defense Reform Act of 1984 ("the Act"), 18 U.S.C. § 17. Indisputably, the Act operated to restrict the availability of the insanity defense to criminal defendants. Because of this, it seems only logical that Congress would not have intended the most expansive definition of "wrongfulness" (under an already expansive insanity rule)—involving a purely subjective standard of morality—to now apply.

After the adoption of the Act, there has been very little judicial discussion of the precise definition of "wrongfulness" as used in § 17. The most extended post-Act discussion is in *United States v. Dubray*, 854 F.2d 1099, 1102 (8th Cir.1988):

Dubray argues next that the trial court erred in refusing to submit his proposed insanity defense instruction to the jury.

*Conclusions Regarding the Affirmative Defense of Insanity*

1. At the time of the commission of the acts constituting the charged offenses, Danser had a mental disease or defect, namely, pedophilia.[14]

2. At the time of the commission of the acts constituting the charged offenses, Danser's pedophilia was not severe. From a psychological perspective, Danser did not convincingly exhibit the DSM–IV criteria for severity: he did not exhibit several symptoms in excess of those required to make the diagnosis of pedophilia, and his symptoms did not *markedly* interfere with his occupational functioning or with usual social activities and relationships with others. While Danser reported dysfunction within his family unit (and is currently involved in divorce proceedings), his marital relationship lasted many years, and his family appeared stable enough to convince the adoption authorities to proceed with the completion of the adoption of Karen Doe. To the extent Danser self-reports the severity of his pedophilia, the court discounts his credibility because of his demeanor while testifying, and the fact that he has repeatedly shown a willingness to misrepresent and manipulate the facts in a self-serving manner. For example, he significantly misrepresented his relationship with James Doe to Dr. Fink and he lied to Detective Swain about the existence of the evidence found in the video store, and specifically about the existence of the videotape depicting the sexual acts performed in North Carolina.

3. At the time of the commission of the acts constituting the charged offenses,

Dubray asked that the jury be instructed that "wrongfulness" implies moral, rather than criminal, wrongdoing, and proposed the verdict director drawing this distinction discussed in *United States v. Segna*, 555 F.2d 226, 232 (9th Cir.1977). Like the Ninth Circuit, our Court recognizes that a defendant's delusional belief that his criminal conduct is morally justified may establish an insanity defense under federal law, even where the defendant knows that the conduct is illegal. *See United States v. Ming Sen Shiue*, 650 F.2d 919, 922 n. 7 (8th Cir.1981). The jury should be instructed on the distinction between moral and legal wrongfulness, however, only where evidence at trial suggests that this is a meaningful distinction in the circumstances of the case. *See id.; Segna, supra*, 555 F.2d at 233.

In this case, there is no evidence that Dubray knew that he was violating the law but nonetheless believed that he was acting morally. The unsuccessful defense case for insanity relied on psychiatric evidence which suggested a complete break with reality, rather than a mental state in which Dubray would have thought of rape as a morally necessary act proscribed by the law. Nothing in the trial record provides a basis on which the jury could believe that Dubray's understanding of moral wrongfulness somehow diverged from his understanding of the legal significance of rape. *Id.* This discussion, while clearly indicating that the definition of "wrongfulness" can mean "*moral* wrongfulness," does not define whether "moral" means 'society's morals' or 'one's own personal morals.' But even if the *Dubray* court meant the latter, and even if this court were to fully accept Danser's position (which the court does not)—that he suffers a severe disease that deludes him into believing that sexual acts with young children does not cause the children harm (and can even be an "enjoyable" and "educational" experience for them)—it would still not avail Danser. *Dubray* indicates that the insanity defense can be available for one who "th[inks] of [the charged crime] as a morally *necessary* act proscribed by the law." *Id.* (emphasis added). There is no evidence that Danser ever believed his molestation was a "morally *necessary* act." He only testified that he did not think it was harmful or, at most, that it was mildly beneficial. An example of "a morally *necessary* act proscribed by the law" would be a person suffering under a delusion that God Almightly had ordered him to kill. *See* I MODEL PENAL CODE § 4.01, appendix C, p. 214. By contrast, Danser's situation is more akin to a marijuana user, who, because of his voluntary use of the drug in the past, has developed a belief that the use of the drug is morally acceptable, even if it is illegal and condemned by most of society. In the court's opinion, this latter situation does not fit within the definition of insanity enacted by Congress in 18 U.S.C. § 17.

14. To the extent Danser had any other mental disease or defect, it has not been shown to be relevant to the remainder of the inquiry under the insanity statute.

Danser was able to appreciate the nature and quality of his acts. Based upon Danser's testimony and inferences drawn from the other evidence, at all relevant times, Danser understood precisely what he was doing and how he was doing it; indeed, Danser does not even contend that he was unable to appreciate the nature and quality of his acts.

4. At the time of the commission of the acts constituting the charged offenses, Danser was able to appreciate the wrongfulness of his acts. This conclusion holds true regardless of which definition of "wrongfulness" (as the term appears in 18 U.S.C. § 17) is used.

Assuming the word means legally wrong, or "contrary to law," Danser clearly fails to show that he was unable to appreciate the wrongfulness of his acts: Danser readily admitted during his testimony that he knew his conduct was illegal; he took extensive steps to conceal his criminal conduct (such as telling Karen Doe not to tell anyone about the sexual acts, hiding his collection of child pornography, and otherwise trying to prevent his wife and others from discovering his sexual conduct); he also counseled a man he shared his interest in child pornography with, Pirie Cleveland, about the illegality of certain photos that Cleveland had delivered to Danser for processing.

Assuming the word "wrongfulness" means "contrary to public morality," Danser again clearly fails to show that he was unable to appreciate the wrongfulness of his acts: Danser's admission during his testimony that he knew most of society condemns his actions and his extensive efforts to conceal his conduct preclude this definition from being met. Indeed, during an interview with Detective Swain just after the arrest, Danser referred to his sexual preference as "probably the most taboo . . . in society."

Assuming the word "wrongfulness" means "contrary to one's own conscience" (the definition advocated by Danser's counsel at trial), Danser still fails to meet his burden of showing that he was unable to appreciate the wrongfulness of his acts. In September 1998, Danser wrote to his wife from jail and said,

> You have no idea how this is effecting (sic) me. First there is the knowledge of why I'm here. I'm so embarrassed (sic), ashamed, disgraced, hurt, remorseful, I can hardly bear it. I cry daily. I feel so badly for my family, and friends it is overwhelming . . . . Weather (sic) we get back together or not, I agree that I have done wrong. Believe that I am sorry as I can be. Believe that I will never again get myself in a position where I can hurt another as I have ever again. Believe I shall seek help with my problems and do my best to make up all I have harmed.

And on May 29, 1998, just nine days after his arrest, Danser wrote the following to Karen Doe from jail:

> [Karen], I felt like I had to write you about those things we did together. You know sex stuff. I'm sorry I allowed that stuff to start. I hope you can forget it all real soon + just be a kid. Stay away from sex for now, be a kid. There will be a time in your life, when you're much older that it may be OK to do sex stuff, but not now.
>
> You did the right thing telling Mommy + that lady about it. We shouldn't have been doing it anyway.

Both of these letters contain expressions of Danser's ability to appreciate the wrongfulness of his conduct as it relates to his own conscience.[15] He made similar expressions to Detective Swain and under oath in this court during the hearing on the motion to suppress, even to the point of admitting that he knew what he had done was wrong. As discussed during the

---

15. Danser's attempt at trial to recast these statements as statements of regret about being caught, and nothing more, is unconvincing.

Findings of Fact, Dr. Fink's opinion is not persuasive: it lacks any reliable (scientific or otherwise) foundation and is based upon an unquestioning acceptance of Danser's self-reports, without accounting for the numerous instances in which Danser has misrepresented the truth in an effort to downplay his culpability (including Danser's lies to Dr. Fink about James Doe). And indeed, Dr. Fink acknowledged that it is not generally accepted in the field of psychology that pedophilia causes an inability to appreciate the wrongfulness of one's conduct. On the other hand, Dr. Rigg's testimony is more persuasive because his opinions correlate with findings in a reliable text in the field of psychology, the DSM–IV, and his opinions are generally supported by the majority of the evidence in this case.

5. Even if Danser in some way failed to appreciate the wrongfulness of his conduct, that failure was not caused by any severe mental disease or defect.

6. Danser has failed to meet his burden of showing the affirmative defense of insanity, as set forth in 18 U.S.C. § 17.

### III. CONCLUSION

The evidence at trial proved beyond a reasonable doubt that Danser was guilty of the offenses charged in each Count of the Indictment. Danser failed to prove by clear and convincing evidence that he met the affirmative defense of insanity. Danser is now adjudged to be GUILTY.

A Presentence Investigation Report is now ORDERED and sentencing will be scheduled as soon as an appropriate review of the Presentence Investigation Report can be completed.